IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * |
| v. | *  Case No. 8:24-cr-00290-PX |
| | * |
| JORDAN JOHNSON, | * |
| | * |
| Defendant. | * |
| | * |

*******

## GOVERNMENT'S SENTENCING MEMORANDUM

The Government submits this memorandum in anticipation of the sentencing of the defendant, Jordan Johnson (the "Defendant"). The Court has set sentencing for **Friday, December 5, 2025 at 10:00 a.m.**[1]  The Government respectfully requests that the Court sentence the Defendant to **30 months of incarceration, followed by three years of supervised release and restitution in the amount of $12,586.70**. This sentence is sufficient, but not greater than necessary, to achieve the sentencing goals set forth in 18 United States Code Section 3553.

## Background

### I. Procedural Background

On October 3, 2024, a federal grand jury returned an indictment charging Defendant Jordan Johnson with involuntary manslaughter, in violation of 18 U.S.C. § 1112(b) (Count One); reckless driving, in violation of 36 C.F.R. § 4.2, incorporating Maryland Transportation Article (MTA) § 21-901.1(a) (Count Two); leaving the scene of an accident resulting in death, in violation of 36 C.F.R. § 4.2, incorporating MTA § 20-102(b) (Count Three); and speeding, in violation of 36

---

[1] The Government anticipates that family members of the deceased victim will make impact statements at the sentencing hearing.

1

C.F.R. § 4.21 (Count Four).  On October 11, 2024, the Defendant had his initial appearance and was released pending the scheduling of a trial date.

A telephonic status conference was held on November 1, 2024.  A second telephonic status conference was held on December 10, 2024.  A third telephonic status conference was held on January 28, 2025.  On the January 28, 2025 telephonic status conference the parties and the Court selected a trial date of January 5, 2026.  On April 7, 2025 the Defendant filed two motions to suppress, one was the Defendant's Motion to Suppress Unlawfully Obtained Evidence and Electronic Data From Tesla (ECF No. 29) and the second motion was the Defendant's Motion to Suppress Unlawfully Obtained Statements (ECF No. 30).  On July 1, 2025 Defendant Johnson signed a plea agreement admitting to involuntary manslaughter.  ECF Nos. 42,43.  A rearraignment was held on July 31, 2025, and on that day the Defendant pleaded guilty to Count One of the Indictment.  ECF Nos. 41.

## II.     Factual Background

On Sunday, March 20, 2022, at approximately 4:45 a.m., United States Park Police (USPP) was notified of a multi-vehicle crash on the Clara Barton Parkway causing life threatening injuries.[2]  A blue Honda Accord and a black Toyota Corolla had been involved in a crash and were disabled in the roadway.  Shortly after the two cars became disabled, the black Toyota Corolla was struck by a white Tesla Model S.  The victim, the operator of the Toyota, had been standing outside of the Toyota when it was struck by the Tesla.  The driver of the Toyota was pronounced dead on scene by Montgomery County medic personnel.  The deceased victim was found lying supine in the middle of the parkway, having been thrown 180 feet east of the black Toyota.  The bridge,

---

[2] The first 911 call was received by Montgomery County Police Department dispatch at approximately 4:15 a.m.

where the most harmful event occurred, spans Little Falls Branch, a tributary of the Potomac River, and is approximately 60 feet long.  The white Tesla was driven by the Defendant, Jordan Johnson.

After the crash, the Defendant and his female passenger walked away from the scene of the crash.  USPP Officer Lloyd Johnson saw the Defendant and the passenger walking on the sidewalk in the area of Clara Barton Parkway and Chain Bridge Road.  Officer Johnson spotted the Defendant and his passenger approximately half of a mile from the scene of the crash.  When Officer Johnson saw the Defendant and the passenger walking down the street, approximately 10-15 minutes had passed since the crash occurred. When the Defendant and the passenger got to the intersection where Officer Johnson was sitting, they began walking away from him.  Officer Johnson exited his vehicle and walked towards the Defendant and the passenger and asked them to stop walking.  The Defendant and the passenger told Officer Johnson that they were "just walking."  The Defendant told Officer Johnson that he had just picked up the passenger from work and that he was taking her home.  Officer Johnson asked them if they were involved in a car crash. The Defendant said yes. Officer Johnson asked them if they would go with him to the scene of the car crash and talk to USPP officers there.  The Defendant agreed.  Officer Johnson then transported them both back to the crash scene.

At the crash scene, USPP Detective Kevin Turner and Officer Mike Alto spoke with the Defendant and the passenger.  Officer Alto asked the Defendant and the passenger if the Defendant was in one of the vehicles that had the car crash.  The Defendant said yes.  The Defendant said "I was the one driving."  Officer Alto asked the woman if she was a passenger in the vehicle and she said she was.  Officer Alto asked the Defendant if the Tesla was registered to him and the Defendant advised that the Tesla was a ride share from the apartment building where he lived.  Detective Turner asked the Defendant why he walked away from the scene of the crash.  The

3

Defendant said he knew the police would find him through his ride sharing agreement. Detective Turner advised the Defendant that he would likely be charged at a future date, and he was then released along with his female passenger.

The passenger wrote a statement about the crash, stating:

> We got in an accident. We were driving and did not see the car that was hit and in the middle of the street since it was very dark and their [sic] was no lights on the road or any cars. We got out of the car and saw the people that had got in the previous accident and a man bleeding on the floor.

Detective Turner then contacted the Novel South Capital apartment building, where the Defendant lived, and from where the car had been borrowed. Detective Turner discovered that the Tesla was driven from the Novel South Capital apartment building at approximately 3:32 a.m. Detective Turner then contacted Envoy LLC, the ride sharing company responsible for arranging and coordinating the use of the Tesla by the Defendant. Envoy LLC was the lessee and registered owner of the vehicle. Shaed Inc. was the lessor. The apartment building itself has no involvement in the leasing or loaning out of the Envoy vehicle.

A representative of Envoy LLC informed Detective Turner that on the date of the car crash, the Defendant informed Envoy that he had been involved in a crash. At that time the Defendant also informed Envoy that the vehicle he struck had been in the middle of the roadway at the time of the collision. The Defendant did not tell Envoy that someone had died as a result of the crash or that he had left the crash scene on foot.

Detective Turner requested Tesla data and files from the Envoy representative. The representative consented to Detective Turner receiving and reviewing the requested information. Tesla produced an EDR Report. This EDR report contains information such as speed, air bag deployment status, seat belt usage, steering wheel angle, longitudinal acceleration, and multiple data points related to the vehicle's Restraints Control Module. The Tesla had also recorded all of

the movements of the Tesla while it was driven by the Defendant from 3:32 a.m., the time he left his apartment, through the time of the car crash, which occurred at 4:14 a.m. *See* Exhibit 1 (Tesla Video). This information was used by USPP crash reconstructionist, Lieutenant Matthew Manning to evaluate the crash scene and the events that led up to the crash. Based on event recorder data maintained by Envoy, as well as video evidence recorded by the Tesla camera system, the Tesla, operated by the Defendant, was traveling between 95 and 99 miles per hour in the five seconds prior to the crash, or in excess of 139 feet per second. The speed limit for the Clara Barton Parkway is clearly posted at 35 miles per hour.

### **Statutory Sentencing Factors Under 18 U.S.C. § 3553(A)**

The statutory factors for the Court's consideration under 18 U.S.C. § 3553(a) include: (1) the nature and circumstances of the offense and history and characteristics of the defendant and (2) the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford deterrence, protect the public, and provide the defendant with needed services. "In determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." U.S.S.G. § 1B1.4; *see also* 18 U.S.C. § 3661. "The district court is given "some latitude," and "a degree of deference," to tailor a particular sentence to the circumstances. *United States v. Green,* 436 F.3d 449, 456-57 (4th Cir. 2006); *United States v. Moreland,* 437 F.3d 424, 433 (4th Cir. 2006).

The Government submits that a sentence of 30 months of imprisonment followed by three years of supervised release is sufficient, but not greater than necessary, to achieve the sentencing goals set forth in 18 U.S.C. § 3553. The Court should impose this 30-month sentence because the

nature and circumstances of the offenses are very serious and because the victim's death, caused by the Defendant's actions, has deeply impacted the victim's surviving family members. Additionally, a three-year term of supervised release will assist with both rehabilitating the Defendant and protecting the public from further crimes. The Government agrees with the U.S. Probation Office's recommendations that, in addition to the standard and mandatory conditions of supervised release, the Court should order special conditions including substance abuse testing and treatment. The Government does not propose a fine, in light of its priority that funds be paid towards restitution.

## I. Sentencing Guidelines Calculation

The Government agrees with the Presentence Report that the Defendant's adjusted total offense level is 19 and his criminal history category is III, resulting in an advisory guidelines range of 37 to 46 months. PSR ¶ 58.

*Total Offense Level:* The base offense level for a violation of 18 U.S.C. § 1112(b) involving the reckless operation of a means of transportation is 22 pursuant to U.S.S.G. §2A1.4(a)(2)(B). PSR ¶ 15.

The Government agrees to a two-level reduction pursuant to U.S.S.G. § 3E1.1(a) for the Defendant's acceptance of responsibility. The Government will also move for a one-level reduction pursuant to U.S.S.G. § 3E1.1(b) because the Defendant "timely notif[ied] authorities of his intention to enter a plea of guilty."

*Criminal History Category:* The Defendant's criminal history score is five, which results in a criminal history category of III. *See* PSR ¶ 30-36.

*Guidelines Range:* An adjusted offense level of 19 and a criminal history category of III results in an advisory Guidelines range of 37-46 months of imprisonment. Accordingly, the

Government notes that the Defendant received a substantial sentencing benefit by virtue of his specific plea agreement in this case—but the Guidelines nonetheless provide some guidance as to the gravity of the conduct at issue.

I.   **Section 3553(a) Sentencing Factors**

The Government respectfully submits that a sentence of 30 months imprisonment—which is below the applicable Guidelines range—followed by three years of probation, will be sufficient, but not greater than necessary in light of the relevant § 3553(a) factors.

    A.  **Nature and Circumstances of the Offense**

Under 18 United States Code Section 3553(a)(2), this Court must consider the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. Here, the offense is exceptionally serious: the Defendant killed an innocent person in the course of breaking multiple laws put in place to protect the public safety. The loss of this young man, who was only 23 years old, has devastated many of his family members, especially his parents and his brother. *See* Exhibits 2–6 (Victim Impact Statements). It is unnatural for parents to have to bury their children. The loss of a child causes unimaginable pain and because this loss was participated by the Defendant, the Defendant should be held accountable.

This car crash was extremely violent. One of the things that makes this case unique is that this Court has had an opportunity to actually see the actual crash, as it happened, from the point of the view of the Defendant. *See* Exhibit 1. This video recording was taken from the front camera of the Tesla that the Defendant was driving. The video was constructed by United States Park Police Detective Kevin Turner. The total recording is a 6 minute video that is taken from approximately 45 minutes of video recording of the Defendant's driving. This video shows the

sheer recklessness and dangerousness of the Defendant's driving. The Defendant drives down one-way streets, drives through solid red circular traffic lights, drives on the road shoulder and drives at a very high rate of speed. The Defendant's driving is inherently dangerous…inherently reckless. This driving is even more dangerous when it takes place on a dark, windy road like Clara Barton Parkway, where the crash occurs.

The Defendant was traveling between 95 and 99 miles per hour in the five seconds prior to the crash, or in excess of 139 feet per second. The speed limit for the Clara Barton Parkway at the location of the accident is 35 miles per hour. The speed limit sign can be clearly seen in the seconds prior to the crash. There is no justification for this type of driving, especially on a road like the Clara Barton Parkway. It is true that the decedent's car was disabled in the roadway at the time of the crash. However, if the Defendant had been driving at or near the posted speed limit of 35 miles per hour the Government believes that the Defendant would have been able to see the decedent's car in the roadway and would have been able to stop before making impact.

The video shows that cars coming from the other direction were slowing down as they were approaching the previous accident. The lights of these oncoming vehicles were clearly visible to the Defendant. A prudent, responsible driver would have seen the cluster of lights facing him and would have slowed down to assess the situation. The reconstruction report indicates that no brakes were applied in the seconds prior to the crash. This type of reckless behavior and the total devastation that it has caused is worthy of a sentence at the highest level of our agreed upon range—a sentence of 30 months of imprisonment.

Other courts have suggested that the Guidelines—which put the base offense level at 22— do not adequately capture the seriousness of involuntary manslaughter. *See*, *e.g.*, *United States v. Lente*, 759 F.3d 1149, 1159 (10th Cir. 2014) (affirming upward variance, in part, because "the

8

history of the involuntary manslaughter Guidelines indicates that the Commission, its working groups, and others have repeatedly expressed concern that the sentencing ranges for involuntary manslaughter generally . . . are too low"); *United States v. Baker*, 2022 WL 4235324, at *3 (D.N.M. Sept. 14, 2022) ("[T]he history of the involuntary manslaughter Guidelines indicates that the [Sentencing] Commission, its working groups, and others have repeatedly expressed concern that the sentencing ranges for involuntary manslaughter . . . are too low.").

Other defendants have been sentenced to lengthy prison sentences in this District for similar conduct. *See*, *e.g.*, *United States v. Tervell Ham*, 8:20-cr-258-TDC (42-month sentence after pleading guilty); *United States v. Stephonze Blakeney*, 8:17-cr-00559-PX (36-month sentence after conviction at trial for homicide by motor vehicle, which carries a maximum sentence of 4 years' incarceration); *United States v. Charles Wiggins*, 8:14-cr-00488-GJH (54-month sentence after conviction at trial); *United States v. Bernardo Lloyd*, 8:12-cr-00354-RWT (63-month sentence after conviction at trial); *United States v. Kristen Smith*, 8:10-cr-00069-RWT (51-month sentence after conviction at trial). A lengthy prison sentence is in order for this Defendant as well.

Furthermore, the guidelines calculations in this case do not take into account that after this tragic, deadly, violent car crash occurred, this Defendant calmly walked away. The passenger who was inside of the car with the defendant said that as they walked away she saw "a man bleeding on the floor." When the Defendant was stopped by a Park Police Officer Turner and was asked why he left the scene, the Defendant said that said he knew the police would find him through his ride sharing agreement. The Defendant knew exactly what had occurred and he chose to leave the scene. The Defendant did not call 911. The Defendant did not contact any emergency personnel. When he did finally come in contact with law enforcement, Park Police Officer Johnson, the Defendant told Officer Johnson that he and his passenger were "just walking." The Defendant

told Officer Johnson that he had just picked up the passenger from work and that he was taking her home.  The Defendant made no mention that he had just been involved in a crash or that a person had been injured.  There is no justification for walking away from the scene of a crash as violent as the one shown in Exhibit 1.  The fact that the Defendant walked away from the scene of this fatal crash is not reflected in his sentencing guidelines calculation.  As such, that decision to completely disregard the life of another human being makes the nature and circumstances of this incident so egregious that a sentence at the top of the agreed upon range is extremely appropriate.

### B.  History and Characteristics of the Defendant

This Defendant has been previously convicted of theft in 2015 and of carrying a loaded handgun on his person in 2022.  PSR ¶ 30-34.  Additionally, the Defendant was convicted of being a felon in possession of a handgun in 2023, after the date of this fatal car crash.   Because this last handgun offense took place after the date of this offense, the sentencing guidelines calculation does not reflect that conviction.  Therefore, this Court should take this recent offense into consideration when determining the appropriate sentence in this case.

Additionally, the Defendant has tested positive for marijuana on two occasions while he has been on pretrial supervision. PSR p. 15.  This Defendant has no respect for the law in general or for the conditions imposed by this court through his pretrial supervision.  Furthermore, this Defendant's driving behavior combined with multiple firearm possession convictions demonstrate that he is a danger to the community.  This Defendant believes that he is an exception both to the law and the rules of human decency that guide many citizens of Maryland.  The community needs to be protected from him for as long as possible.  Therefore, a sentence at the high end of the agreed upon sentencing range is appropriate.

### C. Deterrence

Deterrence is another significant factor for the Court to consider in sentencing. There is no justification for the Defendant's driving behavior on the night of this crash   Driver's licenses are issued by a system in place to make sure that only competent drivers are on the roads.   Speed limits are imposed to account for the width and curvature of the road to ensure safety for all drivers. Despite all of that, throughout the course of his entire driving time on this evening, this Defendant chose to flout the driving laws of Maryland in his every action.  Both the Defendant and the community at large need to understand that this driving behavior can have tragic consequences—like the ones in this very case.   The Government believes that a 30-month sentence of imprisonment and three years of probation will deter the Defendant from engaging in such dangerous activity in the future.

### Conclusion

Based on the foregoing reasons, and any additional information that may be presented at the sentencing hearing, the Government respectfully requests that the Court impose a term of imprisonment of **30 months of incarceration to be followed by a term of supervised release of three years**.  The Government also requests restitution in the amount of $12,586.70.

Respectfully submitted,

Kelly O. Hayes
United States Attorney

By:     */s/ LaShanta Harris*
LaShanta Harris
Ellen E. Nazmy
Assistant United States Attorneys